IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOYCE PALMER,<br>Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| WELLS FARGO BANK, N.A., ET. AL.,<br>Defendants. | : | NO. 06-4504-LDD |

MEMORANDUM

AND NOW, this 10th day of January 2008, upon consideration of Defendant Wells Fargo's Motion for Summary Judgment and Memorandum of Law in support thereof (Doc. Nos. 41, 42), Plaintiff's Motion for Partial Summary Judgment (Doc. No. 43), and Defendant Wells Fargo's Response in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. No. 47), it is hereby ORDERED that Defendant's Motion is GRANTED in part, and DENIED in part. It is further ORDERED that Plaintiff's Motion is DENIED.

I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Joyce Palmer brings this suit against multiple parties in connection with a refinancing loan obtained in October of 2003. (Am. Compl. ¶ 15.) Plaintiff was referred to Calvin Harris ("Harris"), d/b/a Philadelphia Home Improvement Outreach Program ("PHIOP"), who allegedly offered to provide her with home improvement services and to assist her with securing the necessary financing. (Id. ¶¶ 10, 11.)[1] Harris then arranged with Bryn Mawr Mortgage Group ("Bryn Mawr"), through its employee Jonathan Ganz ("Ganz"), to procure a

[1]Plaintiff was originally referred to Harris by way of her neighbor, whom Harris had solicited through a PHIOP mailing.

loan for plaintiff in the amount of $22,400.00. (Id. ¶¶ 12-15.) The loan, underwritten by Wells Fargo Bank N.A. ("Wells Fargo"), carried a note obligation which was secured by a mortgage on plaintiff's residence. (See Pl.'s Ex. A.)

At closing, Bryn Mawr received its broker commission fees and, after other miscellaneous expenses were paid, the total loan proceeds of $19,426.51 were disbursed directly to Harris/PHIOP. (Am. Compl. ¶¶ 15, 16.) Plaintiff alleges that after receiving these funds, PHIOP proceeded to perform "sub-standard" work on her home that "ha[d] no value after factoring in the cost of repair and removal." (Id. ¶ 17.) She therefore claims that the entire loan transaction was a "scheme" designed by Harris to convert the loan proceeds to his own personal use, and that Bryn Mawr and Ganz knowingly falsified her loan application — at Wells Fargo's direction — so that the loan would be improperly approved, to their mutual financial benefit. (Id. ¶¶ 18, 19.)

On or about August 8, 2006, Wells Fargo received notice of plaintiff's demand to rescind the loan contract but failed to respond. (See Pl.'s Memo. At 3.) Two months later on October 10, 2006, plaintiff filed suit against Harris, Harris' associate Catherine Harris, Ganz, and Wells Fargo, seeking rescission and money damages for emotional distress stemming from the defective home improvements and concerns over the imminent foreclosure of her home.[2] After the parties' extensive settlement negotiations ultimately fell through and this Court granted in part and denied in part Wells Fargo's motion to dismiss plaintiff's claims, Wells Fargo filed the instant summary judgment motion on December 14, 2007. That same day, plaintiff filed her own

[2]It should be noted that the instant action is only one of approximately 18 cases pending before the Eastern District of Pennsylvania in which a near-identical fact pattern is alleged against defendants Harris, Ganz, and Wells Fargo.

motion for partial summary judgment against Wells Fargo.

II. LEGAL STANDARD

On a motion for summary judgment, the Court must examine "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," to determine whether there is any "genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In ruling on the motion, the Court must draw all reasonable inferences in the light most favorable to the nonmoving party, and "may not weigh the evidence or make credibility determinations." Boyle v. City of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998); Anderson, 477 U.S. at 255. Therefore, "where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).

III. DISCUSSION

A. Federal Claim

In Count I of her Amended Complaint, plaintiff first contends that Wells Fargo violated the federal Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1605, 1638 (1998), by improperly excluding the hazard insurance premium from its calculation of the loan finance charge.[3] As set

---

[3]Pursuant to 15 U.S.C. § 1635, the borrower of a residential mortgage loan retains a right of rescission where the lender improperly calculates its finance charge by more than the prescribed error tolerance of the greater of $100 or 0.05% of the loan principal. See 15 U.S.C. § 1605(f)(2)(A). Here, the omission of plaintiff's $415.05 hazard insurance premium from Wells Fargo's disclosed finance charge of $1,195.38 would have exceeded the permissible error tolerance.

forth in TILA's implementing Regulation Z, 12 C.F.R. § 226.4(d)(2)(ii), the insurance coverage for real property used to secure a loan must be disclosed where it is "obtained from or through the creditor." Plaintiff alleges that her hazard insurance was obtained through Wells Fargo by way of its agent, Ganz, because Wells Fargo conditioned the loan on procurement of insurance and because Ganz procured the insurance without plaintiff's knowledge. Furthermore, plaintiff alleges that Ganz was acting as Wells Fargo's agent because Wells Fargo employees regularly instructed him to fabricate borrowers' loan applications in order to ensure their approval.

Whether Wells Fargo and Ganz's interactions rose to the level of an agency relationship is a highly factual question governed by Pennsylvania law. "The basic elements of agency are 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" Scott v. Purcell, 490 Pa. 109, 117 (Pa. 1980) (quoting the Restatement (Second) of Agency § 1, cmt. b (1959)). An agent may act to bind a principal where he has implied authority to do so, since "authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it." Restatement (Second) of Agency § 35. See also Archbishop v. Karlak, 450 Pa. 535, 540 (Pa. 1973) (citing Starling v. West Erie Ave. Bldg. & Loan Ass'n, 333 Pa. 124, 126 (Pa. 1939)). "An agent is authorized to do, and to do only, what is reasonable for him to infer that the principal desires him to do *in the light of the principal's manifestations and the facts as he knows or should know at the time he acts*." Ebasco Servs, Inc. v. Pennsylvania Power & Light Co., 402 F. Supp. 421, 448 (E.D. Pa. 1975) (quoting the Restatement (Second) of Agency § 33) (emphasis in original).

Based on the record before us, a reasonable factfinder could conclude that Ganz acted as Wells Fargo's agent for purposes of plaintiff's October 2003 loan transaction and therefore had its implied authority to secure hazard insurance. As issues of implied authority "are determined by reference to the communications between the principal and his agent," Ebasco, 402 F. Supp. at 445, we look primarily to Ganz's deposition. Ganz testified that Ken Stoner ("Stoner"), the Wells Fargo account executive responsible for pre-qualifying the loan applications sent in by Ganz at the time in question,[4] expressly directed him to formulate loan applications in a certain way so that they would be ensured approval by Wells Fargo's underwriters. Ganz stated that Stoner "explained to me what he wanted to see on the application." (Ganz Dep. 73:9-10, Oct. 19, 2007). In particular, "Mr Stoner would specifically tell us to make sure that you only have to put down an account number and state enough assets to make sure there's plenty of assets to close because don't worry about it, we don't verify assets." (Id. 26:22-27:4.)[5]

According to Ganz, Stoner instructed him to fill out loan applications in this manner because account executives and mortgage brokers worked on a commission basis and would not

---

[4]Ganz affirmed in his deposition that Ken Stoner was the account executive at Wells Fargo assigned to him when Bryn Mawr began placing mortgages with the bank in late 2003. (Ganz Dep. 65:11-16, Oct. 19, 2007.)

[5]Plaintiff relies heavily on Ganz's additional testimony that another Wells Fargo account executive, Bethann Caligiuri, instructed him to disguise the true purpose of home improvement loans: "I remember telling [Ms. Caligiuri] that I had a client who was doing home improvement and that I wanted to know the best way to format the loans . . . . And she told me the best way to do it was just do cash-out other." (Ganz Dep. 21:1-7.) Plaintiff also points to an email from Ms. Caligiuri to Ganz, in which she stated, "I would have the borrower state she plans to investment [sic] the money into retirement or mutual funds. Definitely do not state to purchase another property or other big ticket item because that will prompt an additional condition." (Ganz Dep. Ex. 9.) However, this evidence is of no moment to this case since Ms. Caligiuri was not employed with Wells Fargo at the time of plaintiff's loan. (See Def.'s Memo. at 7.)

get paid if a loan failed to close. Moreover, he stated that Wells Fargo largely derived its profits from replacing his prepared loan application forms — including the one he prepared for plaintiff — with their own and then securitizing the loans for sale on Wall Street. (Id. 155:12-156:12.) Therefore,

> they would tell you how to handle things. . . . Ken Stoner would tell you, you know, Make sure you put $27,000 down because that's the amount of money you're going to need to show in the stated income, stated asset deal. You know — Don't put investment — or Don't put buying a property; put investment down. That's what they would do.

(Id. 164:22-165:12.)

In fact, Ganz indicated that such instructions to mortgage brokers were standard within Wells Fargo, as well as other sub-prime mortgage lenders. "You get the same type of information from every loan off — every account executive that I dealt with at Wells Fargo, a little beyond the scope of coincidence. And that account executives from every lender in this [sub-prime mortgage] industry tell you the same thing." (Id. 25:11-17; see also id. 146:8-21.) A reasonable inference may therefore be drawn that Wells Fargo manifested its intent that Ganz act to their mutual financial benefit, and that, furthermore, through its express instructions and its power to dictate Ganz's commission earnings, Wells Fargo exercised sufficient control over him such that a principal-agent relationship existed.

Wells Fargo counters plaintiff's evidence with the fact that the Broker Origination Agreement between itself and Ganz's employer Bryn Mawr expressly disclaimed the latter's status as an agent. (See Def.'s Memo. at 11; Def.'s Ex. L.) Relying heavily on Hawthorne v. American Mortgage, Inc., 489 F. Supp. 2d 480 (E.D. Pa. 2007), it argues that the existence of such a disclaimer precludes a finding of agency. We disagree. While Hawthorne did involve

similar disclaimer language, that fact alone was not dispositive of the court's decision. The plaintiff in Hawthorne offered no evidence of agency beyond a generic working arrangement between the lender and mortgage broker, such as the fact that the broker was provided with access to the lender's loan analysis software. See Hawthorne, 489 F. Supp. 2d at 485. The nature of plaintiff's evidence in the instant case is clearly distinguishable.

Wells Fargo additionally submits portions of Ganz's deposition, where he testified that he never represented himself to plaintiff as an employee of Wells Fargo, that he dealt with Wells Fargo non-exclusively, and that he never consulted Wells Fargo on the specific hazard insurer he selected on plaintiff's behalf. (Ganz Dep. 127:4-129:1; 95:18-100:9. See also Joyce Palmer Dep. 108:8-14, Oct. 25, 2007.)

> Q: Would you or your processor ever have informed Wells Fargo of who you would be selecting for insurance?
> A: No.
> Q: Would there be any need to?
> A: No.
> Q: And you wouldn't otherwise contact Wells Fargo to see if there was anyone they wanted to use for insurance?
> A: No. . . . But as long as the overinsurer was acceptable to the lender, they wouldn't overreach and say, You can't — You gotta use this company, or something like that.

(Id. 98:23-99:22.) In light of these facts, an equally reasonable inference may be drawn that Ganz was not acting as Wells Fargo's agent, or, in the alternative, that Ganz exceeded whatever authority he might have had as Wells Fargo's agent when he engaged in the act of procuring hazard insurance. Since genuine issues of fact remain as to the issue of agency and a reasonable factfinder could decide in favor of either plaintiff or Wells Fargo, summary judgment on

plaintiff's federal claim must be denied.[6]

B. State Claim

In Count II of the Amended Complaint, plaintiff purports to assert that Wells Fargo violated Pennsylvania's Home Improvement Finance Act ("HIFA"), 73 Pa. Stat. Ann §§ 500 *et. seq.* (West 2007), which constituted a *per se* violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. Ann. §§ 201-2(4) (West 2007).[7] However, plaintiff is painfully unclear about which HIFA provisions Wells Fargo is alleged to have violated, and despite having gone through discovery[8] she has yet to identify the necessary elements which would establish Wells Fargo's liability.

Construing plaintiff's claims broadly (though we need not do so), we read them to be based on two alternate theories: 1) that Wells Fargo was the assignee of a home improvement

---

[6]However, summary judgment is granted in Wells Fargo's favor with respect to plaintiff's second federal claim, namely, that other miscellaneous credit reporting, tax certification, and administrative fees were improperly excluded from the finance charge. (See Am. Compl. ¶ 27.) Because we agree with Wells Fargo's arguments that these fees were "bona fide and reasonable" and therefore lawfully excluded under Section 226.4(c)(7) of Regulation Z, and since plaintiff failed to address this point in either her own motion or in response to Wells Fargo's motion, summary judgment is appropriate. (See Def.'s Memo. at 14.)

[7]As noted in footnote 6 of our September 19, 2007 Order granting in part, and denying in part Wells Fargo's renewed motion to dismiss, HIFA does not itself provide private litigants with a cause of action for HIFA violations. Rather, "as HIFA qualifies as an unfair or deceptive act, a plaintiff may rely on the UTPCPA for a remedy." Johnson v. Household Mortg. Servs., 2004 U.S. Dist. LEXIS 19162, *10 n.2 (E.D. Pa. Sept. 9, 2004).

[8]Plaintiff's Amended Complaint stated only that the loan "was structured in violation of HIFA by, including but not limited to" violations of 73 Pa. Stat. Ann. §§ 500-407, -408 (West 2007). (Am. Compl. ¶ 35.) Claims based on these two provisions, however, were previously dismissed in our September 19, 2007 Order, and plaintiff has not since amended her complaint to name any additional provisions that Wells Fargo is alleged to have violated. We are therefore left only with the arguments raised in plaintiff's partial summary judgment motion, and nothing else, as plaintiff chose not to respond to Wells Fargo's motion for summary judgment.

contract and is therefore liable under 73 Pa. Stat. Ann. § 500-208 for any right of action plaintiff has against Harris, (see Pl.'s Memo. at 1); or 2) that Wells Fargo as the financing agency for a home improvement contract is liable under 73 Pa. Stat. Ann. § 500-405 for the HIFA violations of its agent.[9]

As to the first, plaintiff sets forth no evidence which raises a genuine issue of material fact as to whether Harris — the contractor — assigned Wells Fargo the home improvement contract. Indeed, plaintiff stated in her previous response to Wells Fargo's renewed motion to dismiss that "[w]here the home improvement nature of the loan was concealed by Wells Fargo, no assignment would result of any home improvement contract." (See Pl.'s Resp. to Wells Fargo's Renewed Mot. to Dismiss at 3.) As to the second, plaintiff sets forth no evidence which raises a genuine issue of material fact as to whether Harris was Wells Fargo's agent. Since "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations . . . of his pleading," both of plaintiff's theories must fail. Anderson, 477 U.S. at 248 (internal quotation marks omitted).

To the extent that she poses an argument distinct from those addressed above, in the last paragraph of plaintiff's partial summary judgment motion she claims that "[i]nsofar as Wells Fargo is the holder of a home improvement installment contract created by the contractor Harris, . . . Wells Fargo is liable for the acts of Harris . . . as a matter of fact and law." (Pl.'s Memo. At 14.) This Court can make neither heads nor tails of this claim. Even assuming that Wells Fargo

---

[9]Equally perplexed by plaintiff's failure to identify which HIFA provisions it has allegedly violated, Wells Fargo is forced to guess at plaintiff's claims, and has also assumed that they are grounded in either 73 Pa. Stat. Ann. § 500-208 or 73 Pa. Stat. Ann. § 500-405. (See Def.'s Reply at 10.)

is a "holder" of a home improvement contract as defined by HIFA, and assuming that Harris's acts created liability under either HIFA or the UTPCPL, plaintiff fails to set forth the crucial link in its chain of logic: that a "holder" under HIFA is automatically liable for the acts of another. We have located no statutory provision or case law which would suggest this to be the case.[10] Summary judgment should therefore be granted in favor of Wells Fargo as to plaintiff's state claim.[11]

An appropriate order follows.

---

[10]For whatever reason, both parties expend nearly all their efforts arguing over whether the loan at issue was a "direct loan" exempted from HIFA regulation. (See Pl.'s Memo. at 10-14; Def.'s Memo. at 17-19; Def.'s Reply at 10-12.) On this point, Wells Fargo urges us to find that HIFA is preempted, *in its entirety*, by the regulations of the Office of the Comptroller of the Currency since Wells Fargo is a federally-regulated national bank. Since we need not reach the issue, we decline to address Wells Fargo's pre-emption argument.

[11]Plaintiff had originally submitted an additional state claim against Wells Fargo, alleging that it had violated the UTPCPL through its own "unfair, deceptive, and fraudulent conduct." (See Pl.'s Am. Compl. ¶ 37.) During discovery, however, plaintiff expressly withdrew these claims in her Answers to Wells Fargo's First Request for Production of Documents and Interrogatories and therefore omitted them from her motion for partial summary judgment. (See Def.'s Ex. G.)